IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang

Civil Action No. 23-cv-01867-NYW-MEH

MAX FIRE APPARATUS, INC.,

      Plaintiff,

v.

ROSENBAUER AMERICA, LLC,

      Defendant.

---

## MEMORANDUM OPINION AND ORDER

---

This matter is before the Court on Defendant's Motion for Partial Summary Judgment (the "Motion" or "Motion for Partial Summary Judgment"). [Doc. 29, filed June 27, 2024]. The Court has reviewed the Motion and the related briefing and concludes that oral argument would not materially assist in the resolution of this matter. For the reasons set forth below, the Motion for Partial Summary Judgment is respectfully **GRANTED in part** and **DENIED in part**.

## BACKGROUND

This case arises out of a contract dispute between Defendant Rosenbauer America, LLC ("Defendant" or "RBA"), a manufacturer of fire and emergency vehicles, and Plaintiff Max Fire Apparatus, Inc. ("Plaintiff" or "Max Fire"), a seller and distributor of RBA vehicles. [Doc. 1 at ¶¶ 6, 8]. Briefly, in 2016, Plaintiff and Defendant entered into a Dealer Agreement that gave Plaintiff the right to market, sell, and service RBA vehicles. [*Id.* at ¶¶ 9–10]. Defendant terminated the Dealer Agreement in 2023. [*Id.* at ¶¶ 45–46]. Plaintiff alleges, among other things, that Defendant's termination of the Dealer

Agreement breached the Agreement and an associated Dealer Handbook and violated Defendant's duty of good faith and fair dealing. [*Id.* at ¶¶ 58, 65–66, 74].

In this case, Max Fire asserts four claims against RBA: (1) breach of contract based on an alleged breach of the Dealer Agreement ("Count I"),[1] [*id.* at ¶¶ 48–58]; (2) breach of contract based on an alleged breach of Dealer Handbooks ("Count II"), [*id.* at ¶¶ 59–66]; (3) a claim based on an alleged breach of the implied duty of good faith and fair dealing ("Count III"), [*id.* at ¶¶ 67–74]; and (4) a claim alleging a violation of U.C.C. § 2-305(2) ("Count IV"), [*id.* at ¶¶ 75–80]. Defendant now moves for judgment in its favor on Plaintiff's first three claims, but only to the extent they seek "future lost profits or lost business value based on wrongful termination" of the Dealer Agreement. [Doc. 29 at 5];[2] *see also* [*id.* at 20 (requesting that the Court "grant [the Motion] and find, as a matter of law, that Max Fire cannot be awarded damages for future lost profits or lost business value based on RBA's termination of the Dealer Agreement")]. Plaintiff has responded in opposition to the Motion, *see* [Doc. 37], and Defendant has replied, *see* [Doc. 40]. The Court addresses the Parties' arguments below.

## LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact

---

[1] Although pleaded as a single count of breach of contract, Max Fire articulates a few different theories of breach of contract with respect to the Dealer Agreement. *See* [Doc. 1 at ¶¶ 49–58]. The instant Motion for Partial Summary Judgment only addresses one theory brought under Count I (i.e., wrongful termination), and thus, the Court does not pass on any other theory.

[2] When citing materials filed on the docket the Court generally cites to the page numbers generated by the CM/ECF system, which appear at the top of each page, rather than the page numbers assigned by the Parties. However, when citing to transcripts, the Court cites to the page and line numbers appearing on the transcript.

and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A
dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve
the issue either way.  A fact is material if under the substantive law it is essential to the
proper disposition of the claim."  *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194
(10th Cir. 2011) (cleaned up).

A movant who does not bear the ultimate burden of persuasion at trial does not
need to disprove the other party's claim; rather, the movant must only point the Court to
a lack of evidence for the other party on an essential element of that party's claim.  *Adler
v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).  Once the movant has met
this initial burden, the burden then shifts to the nonmoving party to "set forth specific facts
showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.
242, 250 (1986) (quotation omitted).  When considering the evidence in the record, the
Court cannot and does not weigh the evidence or determine the credibility of witnesses.
*See Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008).  At all times, the Court
views the record in the light most favorable to the nonmoving party.  *Banner Bank v. First
Am. Title Ins. Co.*, 916 F.3d 1323, 1326 (10th Cir. 2019).

## UNDISPUTED MATERIAL FACTS

The following material facts are drawn from the summary judgment record and are
undisputed unless otherwise noted.

1.      Plaintiff and Defendant entered into the Dealer Agreement in 2016.  [Doc.
29 at ¶ 1; Doc. 37 at 6 ¶ 1; Doc. 1-1 at 1].

2.      The Agreement was "automatically renewed on a yearly basis unless
terminated in writing by either party."  [Doc. 29 at ¶ 8; Doc. 37 at 6 ¶ 8; Doc. 1-1 at 1].

3.     As for the manner of termination, the Dealer Agreement required that "[t]ermination of this Agreement shall be in writing within thirty (30) days of notice via Certified Mail by either party."  [Doc. 29 at ¶ 9; Doc. 37 at 6 ¶ 9; Doc. 1-1 at 1 § 10].

4.     In addition, the Parties agreed to "Anti-Corruption Rules & Ethics."  [Doc. 29 at ¶ 12; Doc. 37 at 6 ¶ 12; Doc. 1-1 at 2].[3]

5.     The Anti-Corruption Rules & Ethics stated that Defendant could "terminate the Agreement with immediate effect" if Plaintiff failed to meet certain ethics obligations or if Defendant's review of Plaintiff's compliance with "anti-corruption and anti-trust rules" resulted in "severe findings."  [Doc. 29 at ¶ 13; Doc. 37 at 6 ¶ 13; Doc. 1-1 at 2 §§ 1–2].

6.     The Dealer Agreement also referenced a "Dealer Handbook," stating that "[Max Fire] shall abide by established [RBA] policies and the latest revision of the [RBA] Dealer Handbook."  [Doc. 29 at ¶ 5; Doc. 37 at 6 ¶ 5; Doc. 1-1 at 1 § 5].

7.     In November 2022, Plaintiff received an August 2022 version of the Dealer Handbook.  [Doc. 29 at ¶ 14; Doc. 37 at 6 ¶ 14; Doc. 30 at 110:7–111:22].

8.     The Dealer Handbook contained a termination section that stated:

**15.0  Termination**

15.1    Though not the practice of Rosenbauer America to terminate its dealers, occasions arise when this step is necessary.

15.2    Reasons for termination include, but are not limited to, non-performance, marginal performance, or critical failures related to ethical business conduct or behaviors.

15.3    Any decision to terminate a dealer shall be for reasons deemed adverse to the interests and long-term goals and objectives of Rosenbauer America.

---

[3] The Parties dispute whether the "Anti-Corruption Rules & Ethics" were part of the Dealer Agreement or constituted a separate agreement.  *See* [Doc. 29 at ¶ 12; Doc. 37 at 6 ¶ 12].

[Doc. 29 at ¶ 18; Doc. 37 at 7 ¶ 18; Doc. 1-4 at 24 § G.15].

9.      The Dealer Handbook also stated that Defendant "reserve[d] the right to deviate from any of [the Dealer Handbook's] policies and procedures, if special circumstances warrant such action, as determined by the President of [RBA]." [Doc. 29 at ¶ 21; Doc. 37 at 7 ¶ 21;[4] Doc. 1-4 at 9 § A.7.1].

10.      On February 17, 2023, Defendant sent Plaintiff a letter terminating the Dealer Agreement with 15 days' notice. [Doc. 29 at ¶ 22; Doc. 37 at 7 ¶ 22; Doc. 29-1 at ¶ 3; Doc. 29-2 at 2].

11.      The letter stated that because RBA "recently became aware that Max Fire is experiencing cash constraints and is unable to pay its obligations as they become due," RBA had elected to terminate Max Fire as a dealer. [Doc. 29 at ¶ 23; Doc. 37 at 7 ¶ 23; Doc. 29-2 at 2].

## ANALYSIS

As mentioned above, Defendant seeks partial summary judgment in its favor on Counts I, II, and III, to the extent these claims seek lost profits or lost business value damages arising out of RBA's termination of the Dealer Agreement. [Doc. 29 at 5]. The Court addresses each claim in turn.

## I.      Count I:  Breach of Contract – Dealer Agreement Termination

Defendant first contends that Plaintiff's Count I fails to the extent it is "based on [RBA] terminating the [Dealer Agreement] without cause" because the Dealer Agreement does not require for-cause termination. [*Id.* at 12]. It argues that the Dealer Agreement

---

[4] Plaintiff disputes Defendant's "characterization of section A.7.1" but does not dispute that this language is contained in the Dealer Handbook. [Doc. 37 at 7 ¶ 21].

is unambiguous and permits termination for any reason (or no reason), such that termination of the Dealer Agreement without cause could not have been a breach of the Agreement.  [*Id.* at 12–15].  Max Fire counters that the Dealer Agreement is "[c]onfusing and [a]mbiguous" and that it cannot be terminated at will.  [Doc. 37 at 11].  It also directs the Court to extrinsic evidence regarding the Parties' subjective impressions of what the Dealer Agreement required with respect to termination and argues that the Court should credit this evidence to find that "both parties to the Dealer Agreement understood that termination could only be for cause."  [*Id.* at 17–19].

### A.    Interpreting Contracts Under Colorado Law

This Court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332, *see* [Doc. 1 at ¶ 4], and for this reason, the Court applies the substantive law of the forum state, including the forum's choice-of-law rules, *Berry & Murphy, P.C. v. Carolina Cas. Ins. Co.*, 586 F.3d 803, 808 (10th Cir. 2009) (applying Colorado law).  The Parties agree that Colorado law governs this case, *see* [Doc. 29 at 11–12; Doc. 37 at 10], and the Court follows the Parties' mutual understanding, *see Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008).

"In a contract case, a motion for summary judgment allows for contract interpretation as a matter of law."  *Stroh Ranch Dev., LLC v. Cherry Creek S. Metro. Dist. No. 2*, 935 F. Supp. 2d 1052, 1055 (D. Colo. 2013) (citing *Lake Durango Water Co., Inc. v. Pub. Utils. Comm'n*, 67 P.3d 12, 20 (Colo. 2003)).  "[A] contract must be construed to ascertain and effectuate the intent of the parties as determined primarily from the language of the contract."  *E. Ridge of Fort Collins, LLC v. Larimer & Weld Irrigation Co.*, 109 P.3d 969, 974 (Colo. 2005).  "Courts must examine the contract as a whole and

attempt to determine the [parties'] intent by reference to all of the contract's terms and provisions without viewing clauses or phrases in isolation." *SolidFX, LLC v. Jeppesen Sanderson, Inc.*, 935 F. Supp. 2d 1069, 1085 (D. Colo. 2013), *aff'd*, 841 F.3d 827 (10th Cir. 2016).

Courts are often tasked with determining, as a matter of law, whether contract terms are ambiguous—i.e., whether the terms are "fairly susceptible to more than one interpretation." *E. Ridge*, 109 P.3d at 974 (quotation omitted); *see also Stroh Ranch*, 935 F. Supp. 2d at 1060 (deciding whether a contract is ambiguous is a legal determination for the court to make). If the contract is ambiguous, then "the meaning of its terms is generally an issue of fact to be determined in the same manner as other factual issues." *E. Ridge*, 109 P.3d at 974. In other words, at summary judgment, the "moving party must first show that the contract is unambiguous and can be construed as a matter of law." *Stroh Ranch*, 935 F. Supp. 2d at 1055. If it cannot meet this burden and the Court concludes that the contract is ambiguous, then "interpretation becomes a question of fact requiring extrinsic evidence to clarify the meaning of the contract." *Id.*

However, there is conflicting authority dictating the scope of the interpreting court's review in deciding whether a contract is ambiguous. For example, the Colorado Supreme Court has stated that, "[i]n determining whether a contract is ambiguous, the court may conditionally admit extrinsic evidence on this issue." *Pepcol Mfg. Co. v. Denver Union Corp.*, 687 P.2d 1310, 1314 n.3 (Colo. 1984). Recent state court decisions have reiterated this approach. *See, e.g.*, *In re Marriage of Sunderman*, No. 23CA1237, 2024 WL 3944252, at *4 (Colo. App. July 3, 2024) ("[A] court may consider extrinsic evidence to determine whether an agreement is ambiguous."). But the Colorado Supreme Court

more recently stated that "[a]n ambiguity must appear in the four corners of the document <u>before</u> extrinsic evidence can be considered." *Am. Fam. Mut. Ins. Co. v. Hansen*, 375 P.3d 115, 117 (Colo. 2016). Colorado courts follow this directive, too. *See, e.g.*, *Conlon ex rel. Conlon v. Harder*, No. 23CA0739, 2024 WL 4003337, at *5 (Colo. App. Apr. 25, 2024); *see also Renegade Oil & Gas Co., LLC v. Anadarko Petroleum Corp.*, No. 23CA0129, 2024 WL 4034188, at *4 n.4 (Colo. App. Mar. 7, 2024) (recognizing the conflict in authority).

Even in those cases holding that a court may consider extrinsic evidence in initially deciding whether a contract is ambiguous, it appears well-settled that the types of evidence a court may consider in this circumstance is limited. Specifically, the court "may consider extrinsic evidence bearing upon the meaning of the written terms, such as evidence of local usage and of the circumstances surrounding the making of the contract," but it "may not consider the parties' own extrinsic expressions of intent." *Cheyenne Mountain Sch. Dist. No. 12 v. Thompson*, 861 P.2d 711, 715 (Colo. 1993) (quotation omitted).

### B.    The Dealer Agreement

Defendant contends that it is entitled to partial summary judgment on Plaintiff's Count I—only insofar as it is based on the alleged wrongful termination of the contract—because the Dealer Agreement does not require that termination of the Agreement be for cause. [Doc. 29 at 12]. Max Fire responds that the contract is ambiguous because (1) the language contained in Section 10 of the Dealer Agreement is confusing and unclear, [Doc. 37 at 12]; (2) Section 10 is silent on permissible reasons for termination of the

Agreement, [*id.* at 13–15]; and (3) other circumstances surrounding the contract support a conclusion that both Parties thought termination would only be for cause, [*id.* at 17–19].

### 1.    The Contractual Language

The plain language of the contract is the "starting point" in the Court's analysis. *SolidFX*, 935 F. Supp. 2d at 1085.  The Dealer Agreement's opening paragraph states that the Agreement "shall be automatically renewed on a yearly basis unless terminated in writing by either party."  [Doc. 1-1 at 1].  And Section 10 of the Agreement states, verbatim and in full, that "Termination of this Agreement shall be in writing within thirty (30) days of notice via Certified Mail by either party."  [*Id.* at 1 § 10].  Defendant argues that because there is no provision in the contract requiring cause for termination, then the Agreement may be terminated without cause.  [Doc. 29 at 13–15].  In response, Plaintiff focuses on Section 10, arguing that "this language is confusing and badly written" because, as written, it requires termination within 30 days "of notice," not termination *by* 30 days' notice, and provides no guidance as to whether the writing and mail requirements "apply to the termination, the notice of termination, or both."  [Doc. 37 at 12].  Plaintiff also argues that because Section 10 is silent on permissible reasons for termination and "merely establishes the baseline rules regarding the process of termination," [*id.* at 14], "it would be contrary to Colorado law to interpret this silence as an unambiguous assertion that termination is at-will," [*id.* at 13].

As Plaintiff itself states, Section 10 concerns the appropriate manner or method of effectuating termination; it is not the clause within the Dealer Agreement that creates the right to terminate the Agreement.  That right is created in the contract's opening paragraph, which provides that the Agreement "shall be automatically renewed on a

yearly basis unless terminated in writing by either party," without any express limitation on the permissible reasons for termination. [Doc. 1-1 at 1]. The fact that Section 10 is unclear about *how* a party may terminate the Agreement does not create ambiguity as to *why* a party may terminate the Agreement. Indeed, neither the opening paragraph nor Section 10 even suggests that there are substantive requirements before a termination can be effectuated.

Based on this Court's research, it is widely accepted that where a contract is silent on permissible reasons for termination, the contracting parties may terminate the agreement for any reason. *See, e.g.*, *Kindergartners Count, Inc. v. DeMoulin*, 249 F. Supp. 2d 1233, 1243 (D. Kan. 2003) (termination clause with only one requirement—60 days' notice—"include[d] an unambiguous reservation by both parties of discretion to terminate the agreement"); *Dorso Trailer Sales, Inc. v. Am. Body & Trailer, Inc.*, 372 N.W.2d 412, 415 (Minn. Ct. App. 1985) (contract permitting either party to terminate by giving 90 days' notice "unambiguously allow[ed] termination of the agreement at the will of either party" because "[t]he only restriction on termination is the 90 days' notice requirement"); *Haynes Trane Serv. Agency, Inc. v. Am. Standard, Inc.*, 51 F. App'x 786, 789 (10th Cir. 2002) (applying Wisconsin law and affirming lower court's conclusion that contract permitting termination "by either party upon 30 days['] notice to the other" was terminable at will); *Joseph Victori Wines, Inc. v. Vina Santa Carolina S.A.*, 933 F. Supp. 347, 352 (S.D.N.Y. 1996) ("[W]here a contract containing a written termination clause is silent as to whether cause is required for termination, the contract is terminable without cause."). While the Parties do not cite, and the Court could not locate, any Colorado cases directly on point, the Court finds the substantial number of cases interpreting similar

contracts in the same manner to be highly persuasive.  Simply put, "the fact that the termination provision is silent on the subject of grounds for termination does not create an ambiguity." *Morton & Assocs., LLC v. McCain Foods USA, Inc.*, 204 P.3d 167, 170 (Or. App. 2009).

Plaintiff does not direct the Court to *any* legal authority supporting its argument that this sort of silence creates ambiguity.  *See* [Doc. 37 at 14–15].  It argues only that the cases cited by Defendant are "inapposite" because "the Dealer Agreement specifically references the Dealer Handbook, which contains a restriction on termination," whereas the cases cited by RBA "involve stand-alone termination provisions." [*Id.* at 13].  It argues, without supporting legal authority, that the Dealer Handbook "is incorporated by reference" into the Dealer Agreement.  [*Id.*].

Plaintiff's broad-brush argument does not address any of the legal requirements for incorporating a document by reference into a contract.  "In Colorado, for an incorporation by reference to be effective, it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms" and "the terms to be incorporated generally must be clearly and expressly identified." *French v. Centura Health Corp.*, 509 P.3d 443, 449 (Colo. 2022) (quotation omitted).  "General or oblique references to a document to be incorporated, in contrast, are usually insufficient to support a finding that the document was incorporated by reference." *Id.* at 450.  Plaintiff does not argue that the Parties had knowledge of and assented to the terms of the 2022 Dealer Handbook at the time they executed the 2016 Dealer Agreement or explain how the Agreement's general requirement that Max Fire comply with all RBA policies and all

iterations of forthcoming handbooks clearly and expressly incorporates the entirety of the 2022 Dealer Handbook into the Dealer Agreement.  *See generally* [Doc. 37].

Moreover, Plaintiff's argument ignores the fact that the Dealer Agreement references the Dealer Handbook only to require that *Max Fire* comply with the Handbook; there is no similar provision in the Agreement requiring *RBA* to comply with the Handbook. *See* [Doc. 1-1 at 1 § 5]; *cf.* 11 Williston on Contracts § 30:25 (4th ed. May 2024 update) ("[W]hen incorporated matter is referred to for a specific purpose only, it becomes a part of the contract for that purpose only, and should be treated as irrelevant for all other purposes.").  *Compare* [Doc. 1-1 at § 5 ("[Plaintiff] shall abide by . . . the latest revision of the [RBA] Dealer Handbook.")], *with Peace v. Panorama Orthopedics & Spine Ctr., Inc.*, No. 23-cv-01027-PAB-JPO, 2024 WL 4123498, at *7 (D. Colo. Sept. 9, 2024) (concluding that extraneous document was incorporated by reference into a contract where the signatory to the contract expressly acknowledged *and* agreed to be bound by the terms and conditions of the document).

Furthermore, reviewing the Dealer Agreement with the Anti-Corruption Rules & Ethics also supports a finding that the Dealer Agreement unambiguously permits at-will termination.[5]  Unlike the Dealer Agreement, the Anti-Corruption Rules & Ethics expressly

---

[5] Max Fire contends in its Response that the Dealer Agreement is an entirely separate contract from the Anti-Corruption Rules & Ethics document.  *See* [Doc. 37 at 10].  The Court notes that the Dealer Agreement and Anti-Corruption Rules & Ethics appear to share a signature page, *see* [Doc. 1-1 at 1–3], and that Plaintiff referenced both pages together as the "Dealer Agreement" in its Complaint, *see* [Doc. 1 at ¶ 9].  The Court need not decide whether the documents are one contract or two separate contracts because the Parties agree that whether they consist of one or two agreements, the documents must be "[v]iewed together."  *See* [Doc. 37 at 10]; *see also* [Doc. 40 at 5 ("Whether two contracts or one, they were signed via a combined signature page.  As such, principles of interpretation apply to the entire document.")]; 11 Williston on Contracts § 30:25 ("Generally, all writings which are part of the same transaction are interpreted together.").

provide certain circumstances in which RBA can terminate the Dealer Agreement immediately:  (1) upon Max Fire's breach of certain ethical obligations or (2) if there were "severe findings" made during a review of Max Fire's compliance with ethical rules.  [Doc. 1-1 at 2 §§ 1–2].  Together, these documents show the Parties' intent to permit immediate termination in limited for-cause situations but to otherwise require 30 days' notice for termination, with or without cause.  *See Morton & Assocs.*, 204 P.3d at 170 (interpreting similar provisions).[6]  In sum, the Court agrees with RBA that the Dealer Agreement is not ambiguous and does not require that termination be supported by cause.

## 2.    The Circumstances Surrounding the Contract

In the alternative, Plaintiff argues that the Court should consider certain facts surrounding the contract—such as the Parties' course of dealing and the Parties' own extrinsic expressions of intent—to determine the Parties' intent.  [Doc. 37 at 17–19]; *cf.* [*id.* at 16 (Plaintiff relying on its president's "understanding and expectations regarding RBA's obligations to Max Fire")].  Max Fire contends that the Parties' course of conduct is "consistent with an understanding that [RBA] cannot unilaterally terminate a dealer . . . without cause."  [*Id.* at 17].  Relying on *East Ridge*, Plaintiff asserts that the Court "must give effect to the intention of the parties by considering 'competent evidence bearing upon the construction given to the instrument by the parties themselves, by their acts and conduct in its performance.'"  [*Id.* (quoting *E. Ridge*, 109 P.3d at 974)].  However, the *East Ridge* decision does not hold that a court must consider the contracting parties'

---

[6] To the extent Plaintiff's argument that the Dealer Agreement is ambiguous is based on the Dealer Handbook, *see* [Doc. 37 at 11 (Plaintiff arguing that Defendant's argument "ignores . . . the fact that the Dealer Agreement specifically references the Dealer Handbook, which requires for-cause termination")], the Court addresses that argument below.

construction of the contract or related acts to determine if a contract is ambiguous. Rather, the *East Ridge* court stated:

> When an ambiguity has been determined to exist, the meaning of its terms is generally an issue of fact to be determined in the same manner as other factual issues. Courts must *then* give effect to the intention of the parties by considering competent evidence bearing upon the construction given to the instrument by the parties themselves, by their acts and conduct in its performance. Thus, *when a court determines that a document is ambiguous*, it may *then* consider parol evidence to explain or clarify the meaning of a document or the effect of its provisions.

109 P.3d at 974 (quotation and citations omitted and emphasis added). In other words, the Court may consider evidence of the Parties' own interpretation of the Agreement or the Parties' conduct only after an initial determination that the Agreement is ambiguous, and not before. *See id.* Indeed, "extrinsic evidence cannot create ambiguity" in a contract, but is instead "an aid to ascertaining the intent of the parties once an ambiguity is found." *Hansen*, 375 P.3d at 117. And even if the Court were to consider extrinsic evidence to decide whether the contract is ambiguous, it *cannot* consider "the parties' own extrinsic expressions of intent." *Cheyenne Mountain Sch. Dist.*, 861 P.2d at 715 (quotation omitted); *see also Renegade Oil*, 2024 WL 4034188, at *4 (declining to rely on the plaintiff's president's attestations "to his own expectations at contract formation").

Plaintiff's argument does not change the Court's determination that the Dealer Agreement is unambiguous. Therefore, the Court agrees with RBA's argument that "termination without cause cannot be the basis for a breach of contract claim." [Doc. 29 at 15]. The Motion for Partial Summary Judgment is respectfully **GRANTED** with respect to Count I, insofar as it is based on the alleged wrongful termination of the Dealer Agreement. *See* [Doc. 1 at ¶¶ 1, 47; *id.* at 13 ¶ C].

II.    **Count II:  Breach of Contract – 2022 Dealer Handbook**

RBA next turns to Count II, which alleges in pertinent part a breach of the 2022 Dealer Handbook.  *See* [*id.* at ¶¶ 64–66].  RBA argues that "Max Fire does not and cannot allege that the Dealer Handbook is a standalone contract with its own offer, acceptance, and consideration."  [Doc. 29 at 15–16].  Then, it asserts that that there is no provision in the Dealer Agreement or the Dealer Handbook that specifically obligates RBA to comply with the Dealer Handbook or incorporates the terms of the Dealer Handbook into the Dealer Agreement.  [*Id.* at 16].  For these reasons, it concludes that "RBA did not breach the Dealer Handbook by terminating Max Fire under the terms of the Dealer Agreement."  [*Id.*].

As for Defendant's first argument, Max Fire responds that "[u]nder Colorado law, a handbook or policy manual may form the basis of a contract," citing employment-law cases in support.  [Doc. 37 at 16–17].  It argues that the Dealer Handbook "is clearly a contract," but even if it were unclear, "whether the parties have entered into a contract is a fact question for the jury to decide" that cannot be resolved at summary judgment.  [*Id.* at 17].  Plaintiff then asserts that it detrimentally relied on RBA's representations in the Dealer Handbook and suggests that this detrimental reliance supports a promissory estoppel claim.  [*Id.* at 19–20].  Plaintiff does not directly respond to Defendant's argument that the Dealer Handbook places obligations only on Max Fire, not RBA.  *See generally* [*id.* at 15–20].

The Court addresses Plaintiff's last argument first.  In short, the Court need not decide whether the Dealer Handbook is sufficient to support a cognizable promissory estoppel claim because Plaintiff does not assert a promissory estoppel claim in this case.

*See* [Doc. 1].  While Rule 8 of the Federal Rules of Civil Procedure permits a party to plead alternative or inconsistent claims or theories, *see* Fed. R. Civ. P. 8(d)(2), that same rule requires parties to make clear the type of claim they are asserting, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (explaining that Rule 8 requires enough information to give the defendant fair notice of the claim and the grounds on which it rests); *Polovino v. Int'l Bhd. of Elec. Workers, AFL-CIO*, No. 15-cv-00023-JHP-PJC, 2015 WL 4716543, at *4 (N.D. Okla. Aug. 7, 2015) ("[A]t a bare minimum, . . . a complaint must specify the legal basis for any claim.");

Count II is titled "Breach of Contract" with the subheading "Breach of Dealer Handbooks."  [Doc. 1 at 10].  It specifically lists numerous ways in which Defendant allegedly breached the Dealer Handbook.  [*Id.* at ¶¶ 63, 66].  On the other hand, the Complaint does not contain the words "promissory estoppel" or "promise" or allege that Plaintiff relied on any particular promise of Defendant.  *See generally* [*id.*]; *see also Nelson v. Elway*, 908 P.2d 102, 110 (Colo. 1995) (the three elements of a promissory estoppel claim are "(1) a promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee; (2) action or forbearance induced by that promise; and (3) the existence of circumstances such that injustice can be avoided only by enforcement of the promise").  In other words, it is clear from the face of the Complaint that Plaintiff—which is represented by counsel and has been since the beginning of this case—does not assert a promissory estoppel claim in the Complaint.  *See Mann v. Boatright*, 477 F.3d 1140, 1148 n.4 (10th Cir. 2007) (the courtesy of construing pro se filings liberally "need not be extended to licensed attorneys"); *Braun v. Orkin, LLC*, No. 3:20-cv-00432-TAV-DCP, 2021 WL 6275255, at *3

(E.D. Tenn. May 6, 2021) (concluding that complaint did not give notice of any promissory estoppel claim where it "[did] not say the words 'promissory estoppel' and in fact explicitly state[d] a different cause of action").

The United States Court of Appeals for the Tenth Circuit has held that "the inclusion of new allegations in a response to a motion for summary judgment" may be treated "as a potential request to amend the complaint." *Martinez v. Potter*, 347 F.3d 1208, 1211 (10th Cir. 2003). But here, Plaintiff makes no indication that it has any desire to amend its Complaint, as it "never sought leave to file an amended complaint, [it] never asked that [its] response to summary judgment be treated as a request to amend, and [it] never filed an amended complaint." *Fuqua v. Lindsey Mgmt. Co.*, 321 F. App'x 732, 735 (10th Cir. 2009) (finding no error in district court's denial of opportunity to amend). Even construing Plaintiff's new formulation of Count II as an implicit request to amend, the Court declines to permit amendment because any request to amend was unduly delayed—having been raised after the discovery and dispositive motions deadlines, *see* [Doc. 23 at 10]—and because permitting Plaintiff to proceed on a new theory at this late stage of the case would be unfair to Defendant and would prolong these proceedings, *see Marandola v. Pueblo Suzuki, Inc.*, No. 20-cv-02113-CNS-KAS, 2024 WL 4308195, at *8 n.15 (D. Colo. Sept. 26, 2024); *see also Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1365 (10th Cir. 1993) (leave to amend may be denied based on "undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment"). As such, the Court's review is limited to analyzing Count II as a breach of contract claim only, as expressly pleaded.

A.    **The Dealer Handbook as a Standalone Contract**

With respect to the Dealer Handbook, RBA argues that Plaintiff cannot prove that the Handbook is an enforceable contract by itself.  [Doc. 29 at 15–16].  In its Response, Plaintiff asserts that "[u]nder Colorado law, a handbook or policy manual may form the basis of a contract."  [Doc. 37 at 16].  It further asserts that "whether the parties have entered into a contract is a fact question for the jury to decide," so even though Plaintiff believes the Handbook "is clearly a contract," this is not an issue that can be decided at summary judgment.  [*Id.* at 17].

The Court is respectfully unpersuaded by Plaintiff's arguments.  First, the Court is not convinced that employment law cases should guide the Court's analysis here. Colorado courts recognize an exception to the at-will employment doctrine where "an at-will employee might be able to enforce termination procedures in an employee handbook under an implied contract . . . theory in some circumstances."  *Trujillo v. Atmos Energy Corp.*, 896 F. Supp. 2d 949, 955 (D. Colo. 2012).  "To enforce termination procedures in an employee handbook, the employee must demonstrate that the employer manifested his willingness to enter into a bargain, and that the employee's initial or continued employment constituted acceptance of and consideration for the procedures."  *Id.* (citing *Cont'l Air Lines, Inc. v. Keenan*, 731 P.2d 708, 711 (Colo. 1987)).  However, Plaintiff directs the Court to no Colorado cases extending this limited doctrine to a business contract between two corporate entities.  *See generally* [Doc. 37].  Absent any such authority, this federal Court declines to approve such a broad extension of state law given the vast differences between an employer-employee relationship and a contractual relationship between two corporate entities dealing at arms' length.  *Cf. Campos de*

*Suenos, Ltd. v. Cnty. of Bernalillo*, 28 P.3d 1104, 1112 (N.M. App. 2001) (applying New Mexico law but explaining that "[t]he recognition of implied-in-fact contracts in the employment setting addresses the imbalance of power between the parties and enforces the reasonable expectations employers create in their employees").

Moreover, even if the Court were to rely on employment law cases to analyze whether the Dealer Handbook can be construed as an implied contract, Plaintiff has not met its burden at summary judgment to establish a genuine issue of material fact as to contract formation. In the employment context, an employee seeking to enforce an implied contract must demonstrate:

> first, that in promulgating the termination procedures the employer was making an offer to the employee—that is, the employer manifested his willingness to enter into a bargain in such a way as to justify the employee in understanding that his assent to the bargain was invited by the employer and that the employee's assent would conclude the bargain—and second, that his initial or continued employment constituted acceptance of and consideration for those procedures.

*Keenan*, 731 P.2d at 711 (citation omitted).

Plaintiff argues that the Dealer Handbook "is supported by Max Fire's continued service as an RBA dealer," but it does not make any argument or present any evidence that RBA's promulgation of the Dealer Handbook constituted any sort of contract offer. *See* [Doc. 37 at 17 (arguing only that "RBA created and distributed the Dealer Handbook to its dealers")]. And Plaintiff's cursory argument that contract formation "is a fact question for the jury that cannot be determined on summary judgment," [*id.*], without directing the Court to specific evidence that creates a genuine issue of material fact as to whether the Dealer Handbook is a contract, is insufficient to survive summary judgment, *Anderson*, 477 U.S. at 250.

B.      Whether the Dealer Handbook Obligates RBA

Even setting aside the above analysis, Defendant provides another basis for the Court to conclude that Plaintiff has not shown that the Dealer Handbook required RBA to provide a cause basis for termination of the Dealer Agreement.  Defendant argues that it has no obligation to comply with the termination provisions in the Dealer Handbook because the Dealer Agreement only requires *Max Fire* to comply with the Dealer Handbook.  [Doc. 29 at 16].  Plaintiff responds that the Dealer Handbook "made clear that [it] applies to both RBA and its dealers" because it "establishes written policies that address the various procedures between the Rosenbauer America companies, as well as to [sic] define the relationship between the Rosenbauer America companies and its dealers."  [Doc. 37 at 15 (quoting [Doc. 1-4 at 8 § A.3.1])].

The Court agrees with Defendant.  The Dealer Agreement provides that Max Fire "shall abide by . . . the latest revision of the [RBA] Dealer Handbook," [Doc. 1-1 at 1 § 5], but it does not contain any similar language obligating RBA to comply with the Dealer Handbook, *see* [*id.*].  And although the Handbook's termination provisions state that "[a]ny decision to terminate a dealer shall be for reasons deemed adverse to the interests and long-term goals and objectives of" RBA, [Doc. 1-4 at 24 §  G.15.3], it also says that RBA, "at all times and at its discretion, reserves the right to deviate from any of these policies and procedures, if special circumstances warrant such action, as determined by the President of the company," [*id.* at 9 § A.7.1].  Plaintiff does not address this language or argue that it does not apply.  *See generally* [Doc. 37].  Thus, neither the Dealer Agreement nor the Dealer Handbook imposed a contractual obligation on RBA to comply with the Handbook's termination provision.

In sum, the Court has concluded as a matter of law that the Dealer Handbook is not a contract and imposes no contractual obligations on RBA, and Plaintiff has not demonstrated any genuine issue of material fact precluding summary judgment. Therefore, to the extent Defendant seeks summary judgment on the portion of Count II alleging a breach of the Dealer Handbook based on the alleged wrongful termination of the Dealer Agreement, *see* [Doc. 1 at ¶¶ 65–66], the Motion for Partial Summary Judgment is respectfully **GRANTED**.

III.    **Count III:  Duty of Good Faith and Fair Dealing**

In Count III, Plaintiff alleges that Defendant breached the duty of good faith and fair dealing by, inter alia, terminating the Dealer Agreement.  [Doc. 1 at ¶ 74].  Defendant seeks summary judgment in its favor on this portion of this claim.  [Doc. 29 at 12].  It argues that the covenant of good faith and fair dealing cannot be used to rewrite, contradict, or add to the terms of the Parties' contract.  [*Id.* at 17].  In its Response, Max Fire contends that "[t]he duty of good faith and fair dealing is directly applicable to contracts with provisions like those in the Dealer Agreement which leave terms unspecified."  [Doc. 37 at 21].  It also contends that the Dealer Handbook implicates the duty of good faith and fair dealing because "it is left to RBA to determine what reasons are deemed 'adverse to the interests and long-term goals and objectives of [RBA]."  [*Id.* at 21–22].  According to Plaintiff, RBA violated the duty of good faith when it terminated the Dealer Agreement to retaliate against Max Fire for threatening legal action against RBA.  [*Id.* at 22].

"Every contract in Colorado contains an implied duty of good faith and fair dealing." *Cary v. United of Omaha Life Ins. Co.*, 68 P.3d 462, 466 (Colo. 2003).  This duty, however,

"cannot contradict terms or conditions for which a party has bargained, nor can it inject substantive terms into the parties' contract." *Miller v. Bank of N.Y. Mellon*, 379 P.3d 342, 348 (Colo. App. 2016).

The Court has already concluded that the Dealer Agreement is not ambiguous and permits termination without cause. It has also concluded that the Dealer Handbook does not impose a contractual obligation on RBA to only terminate for cause. Accordingly, to the extent Count III is based on Defendant terminating the Dealer Agreement, the claim is not viable because it contradicts or injects substantive terms into the Parties' contract. *Id.* As a result, the Motion for Partial Summary Judgment is respectfully **GRANTED** to the extent "RBA breached [the] duty by terminating Max Fire." [Doc. 29 at 16].

## IV.   Lost Profits

Finally, Defendant asks the Court to hold, as a matter of law, that Max Fire is not entitled to damages for lost profits or lost business value based on the alleged wrongful termination of the Dealer Agreement. [Doc. 29 at 18–20]. It contends that because the Dealer Agreement is terminable at will, Plaintiff "may only recover the net profits that [it] would have received under the contract before proper termination," so any future lost profits "are unrecoverable" as a matter of law. [*Id.* at 19]. Plaintiff argues that Defendant is not entitled to summary judgment on the request for lost profits or lost business value. It first reiterates that "there are many questions of fact that preclude a finding that there was no breach of contract," so the availability of lost profit damages is not determinable on summary judgment. [Doc. 37 at 23]. It then argues that Defendant's arguments fail as a matter of law. [*Id.* at 23–24]. Plaintiff provides a parenthetical citation to *Randy's Studebaker Sales, Inc. v. Nissan Motor Corp. in U.S.A.*, 533 F.2d 510, 518 n.3, 519 (10th

Cir. 1976), and argues that "[s]imilar to *Randy's Studebaker*, Max Fire had a 25-year relationship with RBA and has hired an expert which considered Max Fire's business history and potential. As such, it is up to a jury to determine what length of profits would appropriately compensate Max Fire for RBA's wrongful conduct." [Doc. 37 at 24 (citation omitted)].

Plaintiff's request for lost profits in this case is based solely on the alleged wrongful termination of the Dealer Agreement. *See* [Doc. 23 at 5 (Plaintiff seeking "for lost profits caused by [RBA's] wrongful termination in breach of the dealer agreement."); Doc. 30-2 at 3–4 (same); Doc. 29 at ¶ 26; Doc. 37 at 7 ¶ 26]. And Defendant's request for a legal determination about the availability of these damages is limited to only those portions of Counts I, II, and III that are based on the alleged wrongful termination of the Dealer Agreement. *See* [Doc. 29 at 5, 12, 20]. But because the Court has already ruled that this portion of all three claims is not viable, the Court need not decide whether Colorado law provides a bright-line rule precluding recovery of lost profits in these circumstances. Indeed, it is axiomatic that if Plaintiff cannot succeed on the wrongful termination portions of Counts I, II, and III, it cannot recover damages—including lost profits or lost business value—on those portions of the claims, either. Deciding this legal issue would have no actual impact on the resolution of the claims at issue in the Motion and would be akin to an advisory opinion. *Cf. Preiser v. Newkirk*, 422 U.S. 395, 401 (1975) ("[A] federal court has neither the power to render advisory opinions nor to decide questions that cannot affect the rights of litigants in the case before them." (quotation omitted)); *S. Utah Wilderness All. v. Smith*, 110 F.3d 724, 730 (10th Cir. 1997) (declining to enter declaratory judgment that "would serve no purpose in th[e] case" because it "would be in the nature

of an advisory opinion"). Accordingly, the Court declines to make any advisory legal determinations about whether Colorado law precludes recovery of lost profits based on the termination of a contract that is terminable at will.

Accordingly, the Motion for Partial Summary Judgment is **GRANTED in part** and **DENIED as moot in part**. It is granted to the extent it seeks judgment in Defendant's favor on Counts I, II, and III insofar as they are based on the alleged wrongful termination of the Dealer Agreement. It is denied to the extent it asks the Court to determine, as a matter of law, that lost profit damages are never available in breach of contract cases if the contract is terminable at will.

## CONCLUSION

For the reasons set forth in this Order, **IT IS ORDERED** that:

(1) Defendant's Motion for Partial Summary Judgment [Doc. 29] is **GRANTED in part** and **DENIED in part**; and

(2) A telephonic Status Conference is **SET** for **January 15, 2025** at **11:00 a.m.** for purposes of setting a Final Pretrial/Trial Preparation Conference and trial date. Counsel for the Parties shall participate using the following dial-in information: **571-353-2301**; Access Code: **783456374**.

DATED: December 17, 2024          BY THE COURT:

Nina Y. Wang
United States District Judge